# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIA CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:12cv1560 ERW |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying

the applications of Demetria Clark for disability insurance benefits (DIB) under Title II of

the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income

(SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b.

Ms. Clark has filed a brief support of her complaint; the Commissioner has filed a

brief in support of her answer. The case was referred to the undersigned United States

Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Demetria Clark (Plaintiff) applied for DIB and SSI in August 2009, alleging she was

disabled as of January 1, 2004, because of schizophrenia. (R.[1] at 98-107, 121.) Her

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

applications were denied initially and following a July 2010 hearing before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at 9-21, 25-43, 47-51, 68-69, 74-77.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Delores E. Gonzalez, M.Ed., V.R.C.,[2] testified at the administrative hearing. She amended her alleged disability onset date to be November 30, 2007. (Id. at 119.)

Plaintiff, thirty-nine years old at the time of the hearing, testified she was then homeless after living in a succession of three shelters. (Id. at 27-30.) She finished the eleventh grade. (Id. at 27.) She had never tried to obtain a General Equivalency Degree (GED). (Id.) She has four children; they all live with their father's mother. (Id. at 36.)

Plaintiff has worked as a housekeeper at a motel and at a hospital. (Id. at 28.) In 1999 and 2000, she worked as a nurse's assistant after completing a six-week training program. (Id.) She was a dialysis technician in a succession of three places. (Id. at 28-29.) She left the last of these jobs in 2004 because of her mental problems and drug use. (Id. at 30.) She was convicted of felony possession of marijuana, given a suspended imposition of sentence, and placed on two years' probation. (Id. at 30-31.) She also has a conviction for being with someone who was using drugs. (Id. at 30.) Plaintiff last used cocaine and marijuana in 2009. (Id. at 31.) From May 2009 to March 2010, she was in a drug treatment center. (Id.)

---

[2]Vocational Rehabilitation Counselor.

Plaintiff testified that she hears unrecognizable voices "a couple of times a week." (Id. at 31-32.) These voices tell her to do such things as urinate on herself or spit, and she complies. (Id. at 32.) The voices used to tell her to hurt herself, but she has not heard them in "awhile." (Id. at 32, 33.) She suffers from depression, causing her to be withdrawn and to sleep a lot. (Id. at 32.) Also, she is paranoid. (Id. at 33.) For instance, she turns the television and radio off because she thinks people are talking to her and can see her through the television. (Id.) She stays in her bedroom and sleeps a lot. (Id.) Her aunt is doing all the chores until she gets better. (Id. at 36.)

Plaintiff is taking Seroquel.[3] (Id.) Her current dose is 700 milligrams, increased from the initial dose of 200 milligrams. (Id. at 33-34.) She had tried Haldol[4] and Risperdal,[5] but both caused her to rock, shake, and grit her teeth. (Id. at 34.)

Plaintiff had tried working a daycare center run by a friend, but her friend told her it was not working out after Plaintiff reported she thought the other employees were talking about her. (Id. at 35-36.)

Ms. Gonzalez testified without objection as a vocational expert (VE). (Id. at 37-39.) She was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and work experience who has no physical restrictions; is able to understand, remember, and carry

---

[3]Seroquel is an antidepressant. Physicians' Desk Reference, 735 (65th ed. 2011) (PDR).

[4]Haldol is an antipsychotic medication prescribed for the treatment of schizophrenia. Haldol, http://www.drugs.com/mtm/haldol.html (last visited Oct. 22, 2013).

[5]Risperdal is an antipsychotic medication used in the treatment of schizophrenia and bipolar disorder. See Risperdal, http://www.drugs.com/risperdal.html (last visited Oct. 22, 2013).

out at least simple instructions and non-detailed tasks; is not able to work in a setting which includes constant and regular contact with the general public; and should not work around alcohol or controlled substances. (Id. at 37-38.) Ms. Gonzalez testified that this hypothetical claimant can perform Plaintiff's past relevant work as a motel housekeeper. (Id.) Reminded that this work was not substantial gainful activity and, consequently, not past relevant work, she responded that Plaintiff's past relevant work is eliminated. (Id. at 38.) Plaintiff can, however, perform work as a bench assembler or pan greaser. (Id.)

Plaintiff's attorney then posed a second hypothetical which required no contact with other people. (Id. at 38-39.) Ms. Gonzalez testified that "[m]ost jobs are going to require some contact with other people." (Id. at 39.)

Work will also be precluded if the hypothetical person has the limitations described by the ALJ but also can not sustain attention or concentration for more than one-third of the work-day and is moderately limited in his or her ability to accept instructions or appropriately respond to criticism. (Id.)

Ms. Gonzalez stated her testimony is consistent with the *Dictionary of Occupational Titles* (DOT) and with *Selected Characteristics of Occupations*. (Id. at 38.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care providers, and an assessment of her mental abilities.

When applying for DIB and SSI,[6] Plaintiff completed a Disability Report. (Id. at 120-28.) She was then 5 feet 2 inches tall and weighed 160 pounds. (Id. at 120.) Her schizophrenia limits her ability to work by causing her to have episodes where she is paranoid and thinks people are against her and are talking about her. (Id. at 121.) She does not like crowds. (Id.) The schizophrenia first interfered with her ability to work and caused her to be unable to work on the same day – March 15, 2005. (Id.) She stopped working, however, on February 1, 2004. (Id.) The job she has held the longest is as a dialysis technician. (Id. at 122.) She had not been in special education classes. (Id. at 126.)

Plaintiff also completed a Function Report.[7] (Id. at 142-49.) Asked to describe what she does during the day, she replied that she sleeps all day "in a depression." (Id. at 142.) She does not take care of anyone else or any pets. (Id. at 143.) She has no problem with personal care tasks. (Id.) She does not prepare her own meals – her aunt does – and does not do any household or outdoor chores. (Id. at 144.) She goes outside often, but does not go shopping. (Id. at 145.) Her only hobby is watching television. (Id. at 146.) She goes to church on a regular basis. (Id.) Because of her mood swings, she has problems getting along with other people. (Id.) Because of her illness, she is withdrawn. (Id. at 147.) Her illness adversely affects her abilities to concentrate and to get along with others. (Id.) She can walk for no longer than twenty minutes before having to stop and rest for ten minutes. (Id.) She

---

[6]Plaintiff had previously applied for DIB and SSI, but had not pursued either application after they were initially denied. (Id. at 131.)

[7]Plaintiff mistakenly completed two Function Reports on the same day. The answers are identical. Only citations to the report that appears first in the record are given.

cannot pay attention for longer than five minutes.  (Id.)  She does not follow written or spoken instructions well.  (Id.)  Nor does she get along with authority figures or handle stress or changes in routine well.  (Id. at 147-48.)  She is paranoid.  (Id. at 148.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications.  (Id. at 161-65.)  There had been no change in her illness, no new limitations as a result thereof, and no new illnesses or impairments.  (Id. at 161.)  She was not taking any medications, prescribed or not, for her illness, nor had she seen any doctor or anyone else since completing the seminal report.  (Id. at 162.)

Plaintiff later reported that she was taking Seroquel and, to help her sleep, Benadryl.  (Id. at 169.)

Plaintiff had reportable earnings in 1988 through 2004, inclusive, and 2007.  (Id. at 109.)  Her highest earnings were $22,607,[8] in 2002.  (Id.)  Her next highest earnings were $9,114, in 1999.  (Id.)

The relevant medical records before the ALJ are summarized below in chronological order and begin with those of the removal of Plaintiff's appendix in December 2005.  (Id. at 199-202.)  The medical records noted that she used cocaine.  (Id. at 199.)

On February 28, 2006, Plaintiff was involuntarily admitted to the Metropolitan Psychiatric Center of the State of Missouri Department of Mental Health (MPC) after having been released from jail the week before.  (Id. at 232-40.)  She had used cocaine daily for the past three years and had used alcohol and marijuana occasionally for the past several years.

_____

[8]All amounts are rounded to the nearest dollar.

(Id. at 234, 235.) She had visual hallucinations and believed that law enforcement and other government agencies were against her. (Id. at 234.) She thought people were following her and trying to hurt her. (Id.) On examination, she was initially evasive and guarded, but became more informative. (Id. at 236.) Her speech was normal in rate and coherency; her thought process was generally goal-directed. (Id.) Her concentration was slightly impaired. (Id.) Her intelligence quotient (IQ) appeared to be in the average range. (Id.) Her affect was constricted and depressed; her insight and judgment were "partial." (Id.) Although she had gone to the MPC to get help, she was "not clearly motivated to get rehab treatment." (Id.) Plaintiff was diagnosed with psychosis, not otherwise specified, cocaine dependence, and cannabis abuse. (Id.) Her Global Assessment of Functioning (GAF) was 30.[9] (Id.) She was placed on Wellbutrin,[10] Zyprexa,[11] and trazodone[12]; was to be given supportive, group, activity, and milieu therapy; and was also to be given substance abuse counseling. (Id.) "Her sleep, appetite, energy, interaction all improved. Psychosis with which she presented with, which could be secondary to drugs, also settled down." (Id. at 232.) She was unwilling to

_____

[9]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 21 and 30 is assigned when "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas . . . ." DSM-IV-TR at 34 (emphasis omitted).

[10]Wellbutrin is prescribed for the treatment of major depressive disorder. PDR at 1616.

[11]Zyprexa is an antipsychotic medication prescribed for the treatment of schizophrenia. *Ibid.* at 1850.

[12]Trazodone is an antidepressant. Trazodone, http://www.drugs.com/trazodone.html (last visited Oct. 22, 2013).

be in inpatient rehabilitation treatment, but was willing to receive rehabilitation treatment on an outpatient basis. (Id.) At discharge on March 6, Plaintiff was alert, easily engaged, cooperative, pleasant, and oriented to time, place, and person. (Id. at 233.) Her speech was normal; her concentration was adequate; her thought process was sequential, logical, and goal-directed; her affect was "full range, euthymic." (Id.) She was prescribed Wellbutrin, Zyprexa, and Cipro (an antibiotic prescribed for a urinary tract infection). (Id. at 232, 233, 239.) Her diagnoses had not changed; however, her GAF was 55.[13] (Id. at 233.) She was to be compliant with her medications and to keep her follow-up appointments. (Id.)

Six days later, Plaintiff was involuntarily admitted to MPC after she went to the emergency room "demanding shelter, food and [an] extra hospital gown." (Id. at 219-27.) Before this, she had been seen twice at the Barnes Jewish Hospital (BJH) emergency room when first reporting that she had been sexually assaulted and next reporting that she was suicidal. (Id. at 222.) When seen at MPC, she was easily agitated and threatened suicide. (Id.) She reported that the she had used crack cocaine "just prior" to going to the emergency room. (Id.) A drug screen was positive for cocaine. (Id. at 219.) She had begun using drugs when she was approximately fourteen years old, had begun using them heavily and regularly in her early twenties,[14] and currently used alcohol and crack cocaine regularly. (Id. at 222.)

---

[13]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

[14]Elsewhere in the MPC records, Plaintiff reported picking up the cocaine "habit" three years earlier. (Id. at 219.)

She had not taken the medications prescribed when she was last discharged.  (Id. at 219.)  It was noted that she "has been unemployed for good number of years and has had legal problems related to drug possession."  (Id. at 223.)  On examination, Plaintiff was hostile, had an irritable and labile affect, and had a logical, sequential, and goal-directed flow of thought. (Id.)  Her speech was "regular in rate and rhythm with loud volume and angry tone."  (Id.) She was "uncooperative with test of concentration, attention and orientation."  (Id.)  She was able to make her needs known, but did not have any insight into the negative consequences of her chronic substance abuse.  (Id.)  She was diagnosed on admission with cocaine dependence, antisocial personality traits, and a GAF of 40.[15]  (Id.)  She was involuntarily admitted and suspected of having a secondary motive of gaining housing.  (Id.)  After being treated with Wellbutrin and trazodone, Plaintiff agreed to participate in an alcohol and drug treatment program.  (Id. at 220.)  At discharge on March 21, Plaintiff was alert, cooperative, and oriented to time, place, and person.  (Id.)  Her speech was normal; her affect was stable and appropriate; and her insight, judgment, and concentration were fair.  (Id.)  She was diagnosed with depressive disorder, not otherwise specified; cocaine dependence; and personality disorder, not otherwise specified.  (Id.)  She was considered "to be an appropriate candidate for rehab treatment" based on her expression of a "strong motivation to quit cocaine."  (Id. at 219.)  Her GAF was 55.  (Id. at 220.)  Her medications included Septra (an antibiotic), Wellbutrin, and trazodone.  (Id.)

---

[15]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).

Plaintiff saw Robert Brady, M.D., at the BJC Behavioral Health Clinic on October 25 after being referred there by the Drug Court. (Id. at 242-45, 256-57.) She reported that she had also been referred there by MPC, but had not followed through with that referral. (Id. at 242, 256.) When recently confined, she had been restarted on her medications and was feeling better and less irritable and agitated. (Id.) She also reported that she had been depressed and angry since childhood. (Id.) She had used marijuana and alcohol for the past twelve years, but reported that she did not have any problems with either. (Id. at 244.) Her sleep, appetite, energy level, and concentration were all okay. (Id. at 256.) She had had a few visual hallucinations of seeing dead people and had thought people wanted to kill her. (Id. at 243, 256) Her medications included Wellbutrin, Depakote,[16] and trazodone. (Id.) Her hygiene was fair; her appearance was calm, attentive, and cooperative; her speech was normal in rate and volume; her affect, insight, and judgment were fair. (Id. at 244, 256.) She was very suspicious of people. (Id.) She was diagnosed with cocaine dependence and history of major depressive disorder. (Id. at 244, 256.) Her GAF was again 55. (Id. at 245, 256.) She was continued on the Wellbutrin, Depakote, and trazodone. (Id.)

On November 29, Plaintiff complained to Dr. Brady of constant headaches, which she attributed to the Depakote. (Id. at 254.) She wanted to try Zyprexa, which had previously helped. (Id.) She was easily irritated and angered. (Id.) Her affect was restricted, but reactive. (Id.) Her insight and judgment were fair to poor. (Id.) Her speech was normal in

---

[16]Depakote is prescribed for the "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features." PDR at 425.

rate and volume.  (Id.)  She had relapsed on cocaine the week before.  (Id.)  She was prescribed Zyprexa and Wellbutrin.  (Id. at 255, 258.)

Plaintiff telephoned Dr. Brady on December 18 for her medications and to report she needed housing.  (Id. at 255.)  She was told that her case manager had picked up her medications the week before.  (Id.)

Plaintiff did not keep her next, January 2007 appointment with Dr. Brady.  (Id. at 255.)

Plaintiff was voluntarily admitted to BJH on November 30, 2007 (her amended alleged disability onset date), after she went to the emergency room with reports of wanting to commit suicide to prevent the government from killing her because they thought she was a terrorist.  (Id. at 188-98.)  Her urine drug screen was positive for cocaine.  (Id. at 189.)  She reported hearing voices laughing at her and, occasionally, making negative statements.  (Id. at 194.)  She further reported she had not seen the MPC psychiatrist since the past May and had not been taking any psychiatric medications.  (Id.)  She attributed both omissions to homelessness and a lack of money.  (Id.)  She had not worked since 2004 after losing her job as a dialysis technician due to depression.  (Id.)  Although her urine drug screen was positive for cocaine, she denied using recreational drugs.  (Id. at 195.)  She was given Haldol.  (Id. at 192, 197.)  In three days, her psychotic symptoms had "remarkabl[y] improve[d]."  (Id. at 188.)  Her GAF, which was 20[17] on admission, was 55 to 60 on discharge on December 4.

---

[17]A GAF score between 11 and 20 indicates that the person is in "[s]ome danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication."  DSM-IV-TR at 34.

(Id. at 188, 193.)  She "was fairly groomed and much improved from arrival with good eye contact."  (Id. at 189.)  Her flow of thought was logical, sequential, and goal-directed.  (Id.)  Her mood was good; her affect was bright; and her insight and judgment were each fair.  (Id.)  She was alert and oriented to time, place, and person.  (Id.)  Her diagnoses were schizophrenia, chronic paranoid type, and cocaine abuse.  (Id. at 188.)  Plaintiff agreed to take monthly Haldol shots as maintenance therapy and to take five milligrams of Haldol at bedtime.  (Id. at 189.)  She was to follow up at a clinic the next week.  (Id. at 190.)

Plaintiff was involuntarily admitted to the BJH inpatient psychiatric ward on January 17, 2008, after being taken to the emergency room when she became belligerent and yelled at police on a grocery store parking lot.  (Id. at 175-87.)  She thought people were talking about her on the televison and radio and that the government was "out to get her in some way."  (Id. at 180, 185, 186.)  It was noted that Plaintiff had not taken Haldol after being released from the previous hospitalization, as was her pattern.  (Id. at 179-80, 183, 186.)  Plaintiff explained her non-compliance by stating that she was "'unable to focus'" sufficiently to get her Haldol prescriptions filled and that she believed the government was poisoning her Haldol shots.  (Id. at 180, 181.)  She knew, however, she needed medication.  (Id. at 182.)  She had a positive urine drug screen for cocaine.  (Id.)  It was further noted her "increasing symptoms of thought disorder" were complicated by her use of cocaine.  (Id. at 186.)  Plaintiff had suicidal ideation, but no plan.  (Id. at 181, 183.)  Her GAF on admission was 21 to 30.  (Id. at 179.)  Her flow of thought was "occasionally tangential but overall [was] sequential and logical."  (Id. at 183.)  Her affect was occasionally agitated and, when not, was

"somewhat blunted." (Id.) Her insight and judgment were fair, i.e., she recognized the voices she heard might not be real and, if not real, she needed medication. (Id.) She was alert and oriented to time, person, place, and situation. (Id.) Her recent and remote memory were intact; her attention was "grossly intact." (Id.) She was restarted on Haldol. (Id. at 175, 183, 187.) During the course of her seven-day hospitalization, her "auditory hallucinations became less distinct and became more of people laughing and audiences cheering in the background." (Id. at 176.) Her persecutory delusions became less intense, and she "was better able to deal with the symptoms she was having and was able to ignore them more easily . . . ." (Id.) She was originally scheduled for an in-house chemical dependency consultation, but the consultation was cancelled due to her lack of interest and to her denial of any problems with substance abuse. (Id.) On discharge on January 24, Plaintiff agreed to take her medications as prescribed and to follow-up with scheduled appointments. (Id.) Her discharge diagnoses were schizophrenia, chronic paranoid type, and cocaine abuse. (Id. at 175.) Her GAF was 35 to 40. (Id.)

Plaintiff was involuntarily admitted after going to the MPC emergency room on May 14, 2009, after threatening members of the chemical dependency group at New Beginnings. (Id. at 206-18.) She had been out of her medication, Haldol, for the past month. (Id. at 210, 211.) The only psychotic symptom she endorsed on admission was auditory hallucinations. (Id. at 210.) She smoked crack cocaine weekly and marijuana four times a day. (Id. at 211.) The day before the incident at New Beginnings, she had smoked crack cocaine. (Id. at 208.) During the admission interview, Plaintiff reported that government agencies were following

her because they were investigating whether she was a terrorist and that a shot given her in the emergency room was poison.  (Id. at 207, 212-13.)  Her GAF on admission was 21.  (Id. at 213.)  She was to be restarted on the Haldol.  (Id.)  After three days, Plaintiff's mental status was described as having improved "from being pathologic to no acute concerns."  (Id. at 208.)  She was not responding to internal stimuli, not reporting any auditory hallucinations, and not delusional.  (Id.)  She refused a Haldol shot and was instead given Risperdal, which she "tolerated well."  (Id.)  She was discharged on May 21 with diagnoses of cocaine-induced psychotic disorder with delusions with onset during intoxication, cocaine abuse, and marijuana abuse.  (Id. at 208-09.)  Her GAF was 71.[18]  (Id. at 209.)  She was given a prescription for a thirty-day supply of Risperdal and agreed to continue with her chemical dependency program.  (Id.)  It was noted she was on Medicaid and able to fill prescriptions. (Id.)  She was to "continue to try to abstain from crack cocaine."  (Id.)  She was to live with her aunt.  (Id. at 206, 215.)

Three months later, on August 14, Plaintiff underwent an adult assessment at BJC Behavioral Health Clinic by Lindsay Brown, B.S.W.  (Id. at 282-87.)  Plaintiff explained that substance abuse treatment was a mandatory condition of her probation.  (Id. at 282.)  Her hygiene and grooming were "acceptable"; her clothing was clean and in good condition.  (Id.) Her medication helped, but she still heard voices.  (Id.)  During the interview, Plaintiff was "rocking back and forth in her chair" and was anxious.  (Id.)  She reported that her sleep and

---

[18]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  DSM-IV-TR at 34.

appetite were "'okay,'" but she had trouble with motivation.  (Id.)  She thought "'people [were] out to get [her], kill her.'"  (Id.) (Second alteration in original.)  She reported that her crack cocaine abuse and dependence began in 2002.  (Id. at 283.)  She also reported a history of suicidal ideation, although she had never acted on such.  (Id. at 283, 285.)  She was not taking any psychotropic medications.  (Id. at 283.)  She was cooperative; made eye contact; had a regular rate and rhythm of speech with normal volume and amount; had a logical and goal-directed flow of thought; and had a full range of affect.  (Id. at 286.)  Her provisional diagnosis was substance induced psychotic disorder; her GAF was 50.  (Id. at 287.)  She was to be encouraged to get her GED and to be assisted in attaining employment.  (Id.)

Five days later, Plaintiff saw Ms. Brown because she (a) "needed somewhere [she] could go to stay on [her] medications," (b) wanted to apply for Social Security, and (c) needed to see a dentist.  (Id. at 246-51, 288-90.)  The social worker referred her to New Beginnings, a treatment program; to a shelter outreach program; to Dr. A. Newman, a psychiatrist; and to MERS Goodwill for housing.  (Id. at 246.)  The worker was also going to assist Plaintiff in (i) finding a dentist and scheduling an appointment and (ii) applying for SSI and DIB.  (Id. at 248, 250.)

Plaintiff saw Dr. Newman in September.  (Id. at 252-53.)  She reported an increase in sleep to a minimum of seven to eight hours and an increase in appetite, resulting in a weight gain.  (Id. at 252.)  She also reported having had auditory hallucinations a few years earlier that lasted seven months.  (Id.)  When she first started using drugs, she had had visual hallucinations.  (Id.)  Her current medications included Risperdal, Depakote, Wellbutrin,

trazodone, and Zyprexa. (Id.) She was on probation until October 2010 for a cocaine possession charge. (Id. at 253.) She had never abused alcohol or marijuana, although she tested positive for the latter. (Id.) The longest period of abstinence from cocaine had been for seven months in 2007. (Id.) On examination, her mood was okay; her affect was constricted; her insight and judgment were currently good; her intellect was average. (Id.) She was alert and oriented to time, place, and person. (Id.) Dr. Newman's impression was of psychosis, not otherwise specified, cocaine dependence, and history of marijuana abuse. (Id.) Plaintiff's GAF was 60. (Id.) She was to follow-up in four weeks. (Id.)

Plaintiff saw Dr. Newman again on October 8, reporting that she was continuing to participate in the outpatient program at New Beginnings and had not used cocaine since that June. (Id. at 293.) She was having increasing difficulties falling asleep and staying asleep. (Id.) Twice she had had auditory hallucinations at night of "'mumbling.'" (Id.) Her energy and appetite were normal. (Id.) On examination, she was observed rocking gently and rhythmically and having a mild resting tremor. (Id.) She reported that the rocking was restful. (Id.) She had good eye contact, insight, and judgment. (Id.) Her flow of thought was logical. (Id.) Plaintiff was to continue on Risperdal and was restarted on trazodone for sleep. (Id.) Her GAF was again 60. (Id.)

Plaintiff told Dr. Newman in December that she had stopped taking Risperdal because of side effects of rocking and mouth movements. (Id. at 292.) Her mood was better; her appetite was good; her energy level was normal. (Id.) She was sleeping well. (Id.) Her relationship with her family was better; her family was letting her stay with them "in [the]

absence of drugs." (Id.) On examination, she neither rocked nor had a tremor. (Id.) Her insight and judgment were good; her affect was blunted. (Id.) Risperdal was stopped; Seroquel and Benadryl were prescribed. (Id.) She was reportedly close to graduating from New Beginnings, and remained an appropriate candidate for outpatient management. (Id.)

When Plaintiff saw Dr. Newman in February 2010, she reported that she continued to have auditory hallucinations, but could not remember their content. (Id. at 291.) The voices did not give her any commands. (Id.) Her paranoia had decreased. (Id.) She had not been using cocaine. (Id.) On examination, she was pleasant, cooperative, and "[f]airly well dressed." (Id.) Her mood was fine; her affect was blunted. (Id.) Her functioning was "good." (Id.) She was "mildly" guarded, but had no prominent delusions. (Id.) She "remain[ed] stable." (Id.) She was apprehensive about changing providers, a move required because she was moving out of the current service provider's area. (Id.) She was continued on Seroquel and Benadryl (Id.)

In May, Plaintiff underwent an intake assessment by Angie Dockins, M.Ed., for the Hopewell Center. (Id. at 295-99, 301, 302-06.) She was then 5 feet 2 inches tall and weighed 182 pounds. (Id. at 302.) She complained of frequent auditory hallucinations and of having paranoid thoughts that people and the government were following her. (Id.) She reported that she volunteered three days a week at a child care center and had quit her job at a dialysis center in 2004 because of problems with her boyfriend. (Id. at 303.) She had been denied SSI and DIB and was to have a hearing that October on her appeal. (Id.) She had a history of crack cocaine abuse beginning when she was 31. (Id. at 304.) She had been using

crack cocaine daily since then until she stopped in May 2009. (Id.) She had completed a program at New Beginnings in March 2010. (Id.) On examination, Plaintiff's dress and hygiene were appropriate. (Id.) She was relaxed, cooperative, and pleasant. (Id.) She reported that she frequently heard voices and sometimes would do as they instructed, .e.g., spit when they told her to spit. (Id.) The voices sometimes told her to hurt herself or someone else; this had not happened for the past year. (Id. at 305.) She thought the television or radio talked to her and the government spied on her through the television and radio. (Id.) Her speech was average in quality, quantity, rate, and volume. (Id.) Her mood was okay; her recent memory was accurate; her remote memory was apparently intact; her insight and judgment were average; her fund of knowledge was intact for her age and educational level. (Id. at 305, 306.) She was oriented to person, place, time, and situation. (Id. at 305.) Her acceptance of her illness was average. (Id. at 306.) She "ha[d] a [sic] adequate history of compliance to [sic] treatment." (Id.) Ms. Dockins's diagnosis was schizoaffective depressed type. (Id.) Plaintiff's GAF was 45,[19] currently and at its highest during the past year. (Id.)

Plaintiff was scheduled for a psychiatric evaluation in August. (Id. at 300.)

Also before the ALJ was an assessment of Plaintiff's mental impairments and their resulting limitations.

---

[19] A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

In November 2009, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Marsha Toll, Ph.D. (Id. at 259-70.) Plaintiff was assessed as having schizophrenia and a substance addiction disorder, i.e., a cocaine-induced psychotic disorder. (Id. at 259, 261, 265.) These disorders satisfied Listing 12.03. (Id. at 259.) If Plaintiff abstained from substance abuse, her disorders would result in moderate restrictions in her daily living activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 267, 269.) Her disorders caused one or two repeated episodes of decompensation of extended duration. (Id. at 269.)

On a Mental Residual Functional Capacity Assessment, Dr. Toll assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 270.) In the area of sustained concentration and persistence, she was moderately limited in two of the eight listed abilities, i.e., carrying out detailed instructions and maintaining attention and concentration for extended periods, and was not significantly limited in the remaining six abilities. (Id. at 270-71.) In the area of social interaction, Plaintiff was moderately limited in two of the five abilities, i.e., the ability to interact appropriately with the public and the ability to accept instructions and respond appropriately to criticism from supervisors, and was not significantly limited in the other three. (Id. at 271.) Plaintiff was not limited in any of the four abilities in the area of adaptation. (Id.)

**The ALJ's Decision**

The ALJ first determined that Plaintiff met the insured status requirements of the Act through March 31, 2009, and had not engaged in substantial gainful activity since her amended alleged onset date of November 30, 2007. (<u>Id.</u> at 15.) The ALJ next found that Plaintiff had severe impairments of cocaine-induced psychotic disorder, depression, and schizophrenia. (<u>Id.</u>) These impairments satisfied Listings 12.03 and 12.09. (<u>Id.</u>) Specifically, the "A" criteria of each was met by Plaintiff's mental health admissions in February 2006, March 2006, January 2008, and May 2009. (<u>Id.</u> at 15-16.) The "B" criteria was met by "medically documented persistence of delusions or hallucinations and marked restriction of activities of daily living, moderate difficulties in managing social functioning and marked difficulties in maintain [sic] concentration, persistence or pace." (<u>Id.</u> at 16.) The ALJ further found that "[f]rom November 30, 2007 through October 7, 2009, [Plaintiff's] statements concerning the limiting effects of her symptoms are generally credible and are supported by the medical evidence." (<u>Id.</u>) The ALJ next found that when Plaintiff stopped her substance use, she continued to have limitations that "cause[d] more than a minimal impact on [her] ability to perform basic work activities; therefore, [her] schizoaffective depressed type disorder is a severe impairment." (<u>Id.</u>) The ALJ then referred to this finding as being that "if [Plaintiff] stopped the substance use, the remaining limitations would *not* significantly limit her ability to do basic work activities." (<u>Id.</u> at 17.) (Emphasis added.)

In supporting this last finding, the ALJ referred to the references (a) in the October 2009 records to Plaintiff "'doing good'" when she did not use cocaine and to her GAF as

being 60, (b) in the December 2009 records to Plaintiff's mood being "'better,'" and (c) in the February 2010 records to Plaintiff remaining stable. (Id.) He noted that Plaintiff's last psychological care was in February 2010. (Id.) He considered the GAF of 45 to be an isolated, unreliable score. (Id.) He noted that her GAF of 60 was but "one point away from her symptoms being considered as mild" and that Plaintiff had not hesitated when answering questions at the hearing. (Id. at 18.) He further noted that Plaintiff "ha[d] received very little medical treatment for any impairment other than substance abuse" and "ha[d] not been diagnosed with or treated for a serious mental impairment that [was] not related to cocaine abuse until a preliminary diagnosis was made by a person who was not a licensed psychologist or psychiatrist." (Id.)

The ALJ next evaluated Plaintiff's credibility, concluding that, when she stopped the substance use, her medically determinable impairments could be expected to produce some of the alleged symptoms, but not to the extent she described. (Id. at 18-19.) He considered the absence of an objective medical basis for the severity of her alleged impairments; the lack of third-party observations supporting her allegations; inconsistencies in Plaintiff's testimony; and her poor work and earnings history. (Id. at 19.)

Without the effects of her substance abuse, Plaintiff had the residual functional capacity (RFC) to perform the full range of light work with additional, nonexertional limitations of (a) understanding, remembering, and carrying out simple instructions and nondetailed tasks; (b) not working in a setting including constant or regular contact with the

general public; and (c) not working in proximity to alcohol or controlled substances. (Id.)
With the RFC, Plaintiff could perform such work as a bench assembler or pan greaser. (Id.)

Additionally, the ALJ found that when Plaintiff stopped the substance use, she had
mild limitations in her activities of daily living; mild limitations in social functioning;
moderate limitations in concentration, persistence, or pace; and no episodes of
decompensation. (Id. at 20.) Absent the substance use, Plaintiff was not disabled. (Id.)
Consequently, the substance use was "a contributing factor material to the determination of
disability." (Id.)

For the foregoing reasons, Plaintiff was not disabled within the meaning of the Act.
(Id.)

## Legal Standards

Under Titles II and XVI of the Act, the Commissioner shall find a person disabled if
the claimant is unable "to engage in any substantial activity by reason of any medically
determinable physical or mental impairment," which must last for a continuous period of at
least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1)(A),
1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment
must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S.
212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the
claimant] is not only unable to do [her] previous work, but cannot, considering [her] age,
education, and work experience, engage in any other kind of substantial gainful work which
exists in the national economy, regardless of whether . . . a specific job vacancy exists for

[her], or whether [s]he would be hired if [s]he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920[20]; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

---

[20]Unless otherwise indicated, all citations to the Code of Federal Regulations are to the 2010 revision in effect at the time of the ALJ's decision.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's

complaints.  **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines "'whether a claimant's impairments keep her from doing past relevant work.'"  **Wagner v. Astrue**, 499 F.3d 842, 853 (8th Cir. 2007) (quoting Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996)).  If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." **Lowe v. Apfel**, 226 F.3d 969, 973 (8th Cir. 2000).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. "'If after reviewing the record, the [C]ourt finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the [C]ourt must affirm the ALJ's decision.'" **Partee**, 638 F.3d at 863 (quoting Goff, 421 F.3d at 789). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred when (1) determining her RFC and (2) evaluating her credibility. The Commissioner disagrees.

Plaintiff's RFC. "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and

the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule. RFC does not represent the *least* an individual can do despite his or her limitations, but the *most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R. 96-8p] cautions that a failure to make the function-by-function assessment could 'result in the adjudicator overlooking some of an individual's limitations or restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-8p, 1996 WL 374184, *1). An ALJ does not, however, fail in his duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68. See also **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not providing "an in-depth analysis of each piece of record"); **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.").

Plaintiff contends the ALJ failed in his duty to assess her RFC by not including a narrative discussion of his RFC findings. The ALJ summarized in detail Plaintiff's medical records, her testimony, and her application reports before setting forth his RFC findings. Any failure to cite the specific portion of the record supporting each element in those findings is,

at worst, a formatting fault and does not reveal a failure to properly consider all the relevant evidence.  See **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (noting that "ALJ must consider all relevant evidence" when assessing a claimant's RFC).

Plaintiff next contends that the ALJ erred by failing to include in his RFC findings limitations arising from her hallucinations and her paranoia – limitations which remained after her substance abuse had ceased.

"'An individual shall not be considered disabled for purposes of this title [referring to Title II] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor to the Commissioner's determination that the individual is disabled.'"  **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010) (quoting 42 U.S.C. § 423(d)(2)(C) and noting that 42 U.S.C. § 1382(c)(a)(3)(J) has a similar provision for Title XVI).  The claimant meets this burden if the ALJ "'is unable to determine whether substance abuse disorders are a contributing factor to the claimant's otherwise-acknowledged disability . . . .'"  **Id.** (quoting Brueggeman v. Barnhart, 348 F.3d 689, 693 (8th Cir. 2003)).

When determining whether a substance abuse disorder is a contributing factor "[t]he key factor" is whether the claimant would still be found disabled if she stopped using drugs or alcohol.  20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).  When making this determination, the claimant's current mental and physical limitations are evaluated to assess whether they would remain if the claimant stopped using drugs or alcohol and, if so, whether the remaining limitations would be disabling.  20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  "When a claimant is actively abusing drugs, this inquiry is necessarily hypothetical, and thus more

difficult than if the claimant had stopped." **Kluesner**, 607 F.3d at 537; accord **Pettit v. Apfel**, 218 F.3d 901, 903 (8th Cir. 2000). The relevant question is not only if the claimant's substance abuse was in remission at the time of the hearing, but is whether it was active during much of the relevant period. **Kluesner**, 607 F.3d at 538; **Vester v. Barnhart**, 416 F.3d 886, 890 (8th Cir. 2005).

In the instant case, the ALJ found Plaintiff satisfied Listings 12.03 and 12.09 when she was abusing drugs, but, when she stopped doing so, she did not. "If the ALJ finds a disability and evidence of substance abuse, the next step is to determine whether those disabilities would exist in the absence of substance abuse." **Kluesner**, 607 F.3d at 538 (citing Brueggemann, 348 F.3d at 694-95).

Contrary to Plaintiff's position, her continuing complaints of hallucinations and paranoia do not establish she was disabled after she stopped abusing drugs. For the period during which Plaintiff was found to be disabled – November 30, 2007, to October 7, 2009 – Plaintiff was hospitalized after going to the emergency room with reports the government was trying to kill her and voices were laughing at her and had a positive urine drug screen for cocaine; was involuntarily admitted to a psychiatric ward after reporting the government was out to get her and people were talking about her on the radio and television and had a positive urine drug screen for cocaine; and was involuntarily admitted to the hospital after threatening members of her chemical dependency group and having auditory hallucinations and with reports that the hospitalization occurred when she was smoking marijuana four times a day and had smoked crack cocaine the day before. The records after October 7, 2009, generally

- 29 -

reflect that Plaintiff had good insight and judgment, a good mood, and good functioning. Although these same records also include reports of hallucinations, those hallucinations are not as extreme as when Plaintiff was abusing drugs. For instance, she told Dr. Newman on October 8, 2009, she had had two auditory hallucinations of "mumbling" during the past month, Record at 293; did not report any hallucinations when seeing him two months later; and, in February 2010, informed him she could not remember the content of her continuing auditory hallucinations, but could remember the voices did not give her any commands.[21] And, although Plaintiff was described as having a blunted affect in December 2009 and February 2010, she was also then described as having good insight and judgment, an improving mood (in December), and a fine mood (in February). Her relationship with her family was better. See **Vester**, 416 F.3d at 889 (holding ALJ had not erred when finding alcoholism was contributing factor to claimed disability; claimant's medical history indicated alcoholism "ha[d] been a substantial barrier to her normal functioning" and included periods when claimant was doing well when sober).

Plaintiff argues her GAF of 45 assigned in May 2010 and described as being her highest GAF during the past year reflects the continuation of her disability after her substance abuse ended. As noted by the Commissioner, however, that GAF was assigned by someone who is not an acceptable medical source, see 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing such sources, which did not include someone with a master's in education), and whose only

---

[21]The Court notes that when testifying in July 2010 Plaintiff described hallucinations of voices telling her to urinate on herself and to spit. The ALJ's finding that Plaintiff was not credible is discussed below.

source of information for the assessment was Plaintiff.  See **Vester**, 416 F.3d at 890 (rejecting licensed professional counselor's assessment that claimant's disability was caused by mental health issues and not alcoholism – counselor was not acceptable medical source).  Plaintiff counters that the GAF of 45 is consistent with the GAF of 50 assigned in August 2009 by Ms. Brown.  Her position is without merit.  Ms. Brown also is not an acceptable medical source.  And, her assessment was preceded three months earlier by a GAF score of 71 assigned by two acceptable medical sources, i.e., two physicians at MPC.

Plaintiff further argues that the ALJ's characterization of her October 2009 GAF of 60 as being "one point away from her symptoms being considered mild" is an improper medical opinion.  "The GAF is a numeric *scale* ranging from zero to one hundred used to rate social, occupational and psychological functioning on a hypothetical continuum of mental health-illness."  **Halverson v. Astrue**, 600 F.3d 922, 925 n.4 (8th Cir. 2010) (internal quotations omitted) (emphasis added).  When determining a specific GAF rating within a selected ten-point range, the assessor is to "consider whether the individual is functioning at the higher or lower end" of the range.  *DSM-IV-TR* at 33.  Thus, a GAF of 60 reflects that Plaintiff was found to be functioning at the higher end of the 51 to 60 range, which indicates moderate symptoms.  See note 13, supra.  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV-TR* at 34 (emphasis omitted).  The ALJ did not improperly make a medical opinion

when characterizing the GAF of 60 as being one point away the range indicating mild symptoms. Instead, his comment was an accurate observation of the GAF's score of 60 in the GAF scale.

When describing his RFC findings, the ALJ included the types of jobs a claimant with that RFC could perform. Plaintiff contends that this is circular logic because it assumes that a claimant with that RFC could perform those jobs irrespective of a VE's testimony. The included jobs are those cited by the VE in her testimony. The ALJ's inclusion of the jobs in his RFC findings rather than in a separate paragraph is, at worst, "[a]n arguable deficiency in opinion-writing technique" that "had no practical effect on the outcome of the case." **Brown v. Chater**, 87 F.3d 963, 966 (8th Cir. 1996) (internal quotations omitted).

Plaintiff next challenges the ALJ's consideration of the dearth of medical treatment when determining whether her disability continued after her substance abuse stopped. She argues that such a consideration is inappropriate because "a mentally ill claimant's noncompliance can be the result of mental impairment." (Pl.'s Br. at 17, ECF No. 13.) "[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." **Pate-Fires**, 564 F.3d at 945 (alterations in original). In **Pate-Fires**, there was no indication in the record that the claimant's noncompliance was due to any cause other than her mental illness. **Id.** at 946. In the instant case, however, there is no indication in the record that Plaintiff's noncompliance was due to any cause other than her substance abuse. In support of her argument, Plaintiff

cites the reference in the January 2008 records to Plaintiff's belief that the Haldol contained poison. This was during the period in which Plaintiff was found to be abusing drugs. Indeed, her urine drug screen indicated that she was then using cocaine. Plaintiff also cites her homelessness and lack of financial resources as causes for her lack of medical treatment. This citation is unavailing given any indication that she sought and was denied free or low-cost medical treatment during the relevant period. See **Goff**, 421 F.3d at 793 (rejecting claimant's argument ALJ erred by considering her failure to take prescription medication when evaluating the severity of her impairments; such failure was not supported by any evidence that claimant had been denied medical treatment due to inability to pay for such).

Plaintiff's Credibility. Plaintiff next argues that the ALJ erred in assessing her credibility.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Boettcher v. Astrue**, 652 F.3d 860, 865 (8th Cir. 2011) (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008)); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). And, while an ALJ must acknowledge and consider the Polaski factors, as did the ALJ in the instant case, the ALJ "'need not explicitly discuss each Polaski factor.'" **Wildman v. Astrue**, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff, 421 F.3d at 791); accord **Lowe**, 226 F.3d at 971-72 (holding that although ALJ was required to make express credibility determinations, he "was not required to methodically discuss each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [the claimant's] subject complaints").

When finding Plaintiff not fully credible, the ALJ properly considered the lack of supporting objective evidence, see **Buckner**, 646 F.3d at 558 (affirming the appropriateness of such consideration); the lack of supporting third-party observations, see **McCoy v. Astrue**, 648 F.3d 605, 614 (8th Cir. 2011) (affirming the appropriateness of such consideration); and her poor work history, see **Dipple v. Astrue**, 601 F.3d 833, 837 (8th Cir. 2010) (listing a claimant's work record as consideration when evaluating her credibility).

Another proper consideration were the inconsistencies in the record. See **McCoy**, 648 F.3d at 614 (inconsistencies in record detract from a claimant's credibility). For instance, Plaintiff's report of when and why she left work were inconsistent, stating at one point that she left work due to conflicts with her boyfriend. See **Kelley v. Barnhart**, 372 F.3d 958, 961 (8th Cir. 2004) (claimant's leaving work for reasons unrelated to medical condition detracted from credibility). Plaintiff's report to various health care providers of when she started abusing drugs and how often she did so was also inconsistent. For instance, she once reported she had started using cocaine in 2003, another time reported she started when she was 31, which was in 2004, and yet another time reported she has started when she was fourteen years old, which would have been in 1985.

Plaintiff contends that the ALJ's finding her allegations credible for the period between November 30, 2007, and October 7, 2009, and not credible after that period is illogical. As noted above, Plaintiff's credibility was primarily for the ALJ to decide. See **Wagner**, 499 F.3d at 851. For the reasons set forth above, that decision is neither illogical nor unsupported.

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner**, 646 F.3d at 556 (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of December, 2013.